FILED
2021 Sep-29  PM 03:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **TAKIYA LAWSON-MCCANTS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO:** |
| | ) | |
| **NATIONAL MENTOR** | ) | |
| **HEALTHCARE, LLC** | ) | **JURY TRIAL DEMANDED** |
| **D/B/A ALABAMA MENTOR,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## COMPLAINT

---

Plaintiff Takiya Lawson-McCants ("Plaintiff" or "Lawson"), by and through her undersigned counsel, hereby makes her Complaint against Defendant National Mentor Healthcare, LLC d/b/a Alabama Mentor ("Defendant" or "AL-Mentor") for violations of Title VII of The Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. and 42 U.S.C. § 1981 on the basis that Defendant (employer) subjected Plaintiff (employee) to a racially hostile work environment and unlawful retaliation. As grounds for her Complaint, Plaintiff states as follows:

### JURISDICTION AND VENUE

1.     This is a complaint for legal and equitable relief to redress violations by the Defendant of the Plaintiff's rights secured by:

a. The Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), as amended;

b. Title VII of the Civil Rights Act of 1964, ("Title VII"), as amended, by 42 U.S.C. § 2000e, *et seq*. and 42 U.S.C. § 1981a.

2. Federal subject matter jurisdiction exists pursuant to:

a. 28 U.S.C. §§ 1331, 1343(a)(3); and

b. Title VII, 42 U.S.C. § 2000e-5(f)(3).

3. Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e–5(f)(3).

## **PARTIES**

4. Plaintiff is an African American, adult female whom Defendant currently employs as a Therapist in Jefferson County, Alabama at its Birmingham (Homewood) location.

5. Defendant National Mentor Healthcare, LLC is a for-profit company that does business under the name "Alabama Mentor" in Jefferson County, Alabama, among other locations, and purports to provide health and human services for individuals living with intellectual and developmental disabilities. Defendant is part of a national organization called "the MENTOR network" which also does business, upon information and belief, under the name "Sevita."

## **NATURE OF THE ACTION**

6. Plaintiff brings this action to redress unlawful practices and acts of

intentional discrimination which Defendant, as Plaintiff's employer, committed and continues to commit.

7.     This lawsuit seeks to redress grievances resulting from actions of Defendant, its agents, servants, and employees with respect to Plaintiff's employment and otherwise.

## **ADMINISTRATIVE PROCEDURES**

8.     On May 28, 2021, and within 180 days of an act contributing to the racially discriminatory hostile work environment about which she complains[1] — and also within 180 days of Defendant's initial unlawful retaliatory actions towards her — Plaintiff (without counsel) filed a Charge of Discrimination with the Equal Employment Opportunity Commission, ("EEOC"), Charge No. 420-2021-01673, alleging violations of Title VII.  (*See* Exhibit A).[2]

9.     On June 30, 2021, the EEOC issued a Dismissal and Notice of Rights on Charge No. 420-2021-01673, which was received on or about July 5, 2021. (*See*

---

[1] Unlike discriminatory acts that are discrete in nature, hostile work environment claims are "composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (citing 42 U.S.C. § 2000e-5(e)(1)). "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117. *See also Shields v. Fort James Corp.*, 305 F.3d 1280, 1282 (11th Cir. 2002) ("Put simply, if the smallest portion of the 'practice' occurred within the limitations period, then the court should consider it as a whole.").

[2] Although she discussed some of the details with the EEOC intake personnel, Plaintiff had some of the more shocking facts omitted from the initial charge because she was afraid — and rightly so, as explained in this Complaint.

Exhibit B).

10.     Plaintiff filed this action within 90 days of receipt of the EEOC's Notice of Rights letter; this action was, therefore, timely filed.

11.     On August 18, 2021, because Defendant's unlawful retaliation has continued even after the EEOC issued its Notice of Right letter, Plaintiff obtained counsel and filed a second Charge of Discrimination, Charge No. 420-2021-02742, alleging further violations of Title VII.  (*See* Exhibit C).

12.     Plaintiff's Second Charge is still pending before the EEOC. Accordingly, she expressly reserves the right to amend this Complaint after the EEOC concludes its investigation and issues a second Notice of Rights letter.

## STATEMENT OF FACTS

13.     Plaintiff earned a master's degree in social work from Samford University. She has utilized the training and education obtained during her advanced studies while working for AL-Mentor as a "Therapist," a position that Plaintiff currently holds and has held since the beginning of her employment with Defendant in approximately May 2019.

14.     As a Therapist, Plaintiff works closely with adults who have agreed to serve as foster parents for AL-Mentor. Plaintiff establishes relationships with AL-Mentor's foster parents and foster children and routinely visits these families in the home to, among other things, ensure they receive appropriate therapeutic

training, care, and support.

15.     Alex Morgan ("Morgan") (Caucasian, female) began working for AL-Mentor in 2019 as a Program Service Coordinator ("PSC").

16.     In approximately mid-2019, early in Plaintiff's employment, Morgan announced that she was from a "Sundown Town." Morgan told Plaintiff something along the lines of: "My dad hangs black people who don't leave town before the sun goes down."

17.     The term "Sundown Town" derives from signs once openly displayed in racist municipalities, neighborhoods, and counties warning African Americans they would be executed (*e.g.*, hung from a tree) if caught in the area after the "sun went down."[3]

18.     Morgan's hometown — Arab, Alabama — is, indeed, historically recognized as one of the most notorious Sundown Towns in the United States.[4]

19.     Plaintiff recalls Morgan "giggling" and repeating herself at least once the first time Morgan spoke about the alleged brutal, racist legacy of her family and Arab, Alabama.

20.     Morgan also made it clear that Arab is still a dangerous place for

---

[3] *E.g.*, Patricia Reid-Merritt, *A State-by-State History of Race and Racism in the United States* (1st ed. 2018) ("The term 'sundown' derives from signs posted at city limits warning African Americans to 'not let the sun go down on you here.'").

[4] *See* James W. Loewen, *Sundown Towns: A Hidden Dimension of American Racism* (1st ed. 2006) ("**Sundown During the Daytime**: A few towns, including . . . Arab, Alabama . . . did not allow African Americans within their city limits even during the day) (emphasis in original).

African Americans (or any person of color) who are, to this day, allegedly unwelcome there.

21.     Morgan's comments deeply disturbed Plaintiff, but she tried to put them out of her mind and focus on serving her families in the field.

22.     Unfortunately, Morgan's Sundown Town declaration was only the beginning for Plaintiff and her African American and biracial co-workers.

23.     <u>Consistently</u> and <u>countless times</u> from approximately summer 2019 until April 2021, Morgan subjected Plaintiff (and her African American co-workers)[5] to the following sort of conduct, among other things:

  a. Morgan routinely referred to people of color, including Plaintiff, as niggers, nigga, blacks, black crispy, black bitch, greedy nigger bitches, mess, dry-head, monkeys, wig-wearing monkey, slave, and inferiors.

  b. Morgan often recounted her family's alleged lynching and hanging activities with pride. She did this one-on-one with African American employees like Plaintiff and also openly during Defendant's staff meetings, among other places. Morgan's description to Plaintiff of racist violence by a relative was akin to an employee regaling a colleague who was a sex assault survivor with tales of a relative committing rape: in other words, profoundly offensive and belittling.

  c. Morgan frequently spoke about the ever-present dangers of Arab for people of color. She said that even African American children would be hung from trees, and that no African Americans were allowed to live in Arab. Morgan claimed that

---

[5] Former AL-Mentor employees Courtney Craig and Carla Jackson (both African American), along with former AL-Mentor foster parent Dorothy Malone (African American), have already come forward as witnesses in support of Plaintiff. These are likely the first of many.

the penalty for hosting an African American or biracial person in an Arab neighborhood after sunset was, at the very least, a burning cross in the yard.

d.  Morgan often claimed she manipulated Defendant into hiring a few "blacks," despite an absurd belief that African Americans are incompetent and lazy, because it made AL-Mentor more likely to withstand race-related public scrutiny.

e.  Morgan's text messages sometimes circulated around the Birmingham office, and these included derogatory racial comments and content.

24.  In 2019, upon information and belief, former AL-Mentor's PSC Courtney Craig (African American, female) reported Morgan's conduct, among other things, to AL-Mentor's Director of Services, Shalisa Grantham (Caucasian, female), and to Joy Grafton (Caucasian, female), Defendant's former Area Director.

25.  Ms. Craig feared retaliation but was assured, upon information and belief, that something would be done to address her concerns.

26.  Plaintiff feared retaliation as well, but she also reported Morgan's comments about Arab and hangings to Grantham, her direct report, in 2019.

27.  Despite complaints of serious misconduct by both Craig and Plaintiff, Morgan remained employed; indeed, Morgan's conduct continued and worsened into late 2019 at which point Meranda Bice (Caucasian, female) assumed the Birmingham Program Director position.

28.  Bice quickly befriended Alex Morgan and Stevie McGhee

(Caucasian, female), the other Birmingham PSC, while excluding African American employees like Plaintiff and Craig at every opportunity.

29.     These Caucasian women participated in a group chat in which they discussed, and shared their research, regarding prospective employees' race.

30.     Bice, too, openly demonstrated discriminatory animus in the workplace.  For example, Bice often referred to African Americans as "these people" and accused African American foster parents of being greedy and "just wanting money."

31.     Bice was vocal about her desire to employ only Caucasian people at the Birmingham location. According to one former employee, "Merenda wanted everyone to be white."

32.     Further, Bice, along with Morgan and McGhee, began "badmouthing" Defendant's African American employees, including Craig and Plaintiff, to "foster families and kids."

33.     Exhausted and frustrated because, among other things, her complaints went unaddressed, Craig resigned in June 2020.

34.     Courtney Craig noted: "I have never been in a work environment like [AL-Mentor] in my 8+ years career experience."  She also said: "I went so far to leave a review on Indeed for Mentor. I did not and do not want anyone especially of color to work for them."

35.     AL-Mentor did worse than nothing with the complaints about Alex Morgan; the company actually *promoted* Morgan. In October 2020, AL-Mentor elevated Morgan from PSC to Recertification Coordinator.

36.     In November 2020, AL-Mentor foster parent Dorothy Malone (African American, female) learned about Morgan's racist behavior and went directly to the AL-Mentor State Director Deanna Hand[6] (Caucasian, female) to report Morgan.

37.     Upon information and belief, Ms. Malone informed Director Hand about many (if not all) of the allegations set forth in paragraph 23, *supra*.

38.     Again, Morgan remained employed and unaffected; nothing improved for Plaintiff or her African American or biracial co-workers.

39.     In fact, Morgan, with her penchant for flagrant and constant racist remarks, remained elevated to a position that enhanced her power to damage and affect African American employees.

40.     Morgan referred to Lawson in vitriolic and racist terms.  She openly referred to Plaintiff as a (1) slave working the field where she belongs, and (2) "a loudmouth black bitch wig wearing monkey nigga," among other awful things.

41.     Morgan began taking Plaintiff off her assigned cases without reason

---

[6] This is date is based on Malone's recollection. Documents indicate she may have made the complaint to Hand as early as March 2020 when Morgan shared her Sundown Town narrative directly with Malone.  Hand remains the State Director to this day, upon information and belief.

or authority and interfering with Plaintiff's ability to serve her families. In one instance, Plaintiff called the foster parent from whose case she was removed and learned that Morgan "asked him to lie on [her] to get [her] removed off the case."

42.     Upon information and belief, in approximately late March of 2019, Plaintiff complained to Birmingham Office Program Director Cassidy Dear (African American, female), her new direct report, about Morgan's misconduct and racism.

43.     A week or so later, upon information and belief, Plaintiff found herself accused (falsely and for the first time) of Medicaid fraud.

44.     In early April 2021 — on Dear's advice — Plaintiff sent AL-Mentor's Human Resources Manager, Mariel Frantz (Caucasian, female), an email titled: "Racism and Harassment in the workplace."

45.     In this email, Plaintiff detailed Alex Morgan's racist misconduct, supplied witnesses' names and telephone numbers, and requested an investigation along with an end to unlawful race discrimination and harassment.

46.     Plaintiff also informed Frantz of suspicious circumstances that led her to suspect Morgan might have access to (and may have been reading) her emails.

47.     A few days after her formal complaint against Morgan, Plaintiff found a noose hanging from a tree in her backyard next to her children's

trampoline.[7]

48.     Plaintiff's cell phone began ringing with calls from Arab, Alabama, and she was then expressly warned (by someone she hesitates to publicly identify) that the Ku Klux Klan is still active and dangerous in Alabama.

49.     Plaintiff and her co-worker, Carla Jackson (African American, female) then filed Charges of Discrimination with the EEOC in May 2021 alleging race discrimination and retaliation; they prepared these Charges without an attorney's assistance.

50.     In response, Defendant hired the largest employment law defense firm in the United States to advance its interests and combat their Charges.

51.     Despite egregious, corroborated allegations against Alex Morgan, Defendant did not fire her.[8]

52.     In early June 2021, Plaintiff and Jackson were targeted with "mandatory arbitration agreements" and told they would lose their jobs if they refused to sign away their right to a jury trial.[9]

---

[7] The racist, threatening symbol staged on Plaintiff's property appears to be a bungee cord that someone hastily fashioned to hold the shape of a noose hanging from a tree. (*See* photographs in Exhibit C). The cord did not have a perfect noose knot, but the message was clear, and Plaintiff received it.  Prior to her complaint about Morgan, Plaintiff had never encountered racist symbols or images on her property.

[8]  Defendant simply offered the already-promoted Morgan a transfer opportunity, which she declined. Upon information and belief, Morgan is currently employed doing similar work for a different institution.

[9]  This "sign it or you're fired" threat looms over Plaintiff's head to this day.

53.     A couple weeks later, also in June 2021, Plaintiff and Jackson were "randomly" given <u>preemployment</u> drug tests. Despite two years of employment with Defendant, Plaintiff had never once been drug tested.

54.     In early July 2021, Plaintiff and Jackson were confronted about alleged attitude problems in a conference call with Program Director Ataska Winsett, Area Director Jenni Akins, and new Birmingham Program Director Cassidy Dear.

55.     Winsett and Akins made no distinction between Jackson and Plaintiff. Plaintiff described the "meeting" in her Second EEOC Charge as follows:

> I was lumped in with [Jackson] . . . and told things like 'y'all are negative.' I asked for clarification so that I could know exactly what I had done wrong so that I could fix it. I wasn't given clarity. My direct report, Cassidy, backed me up verbally and in writing, letting me know that I did the right thing.

56.     A few weeks later, on July 26, 2021, Plaintiff received her first ever disciplinary action, which was disguised as a "record of discussion." Winsett falsely accused Plaintiff of a negative attitude and of lacking proper respect, among other conveniently subjective nonsense.

57.     Cassidy Dear, Plaintiff's direct report, verbally expressed her disagreement with the discipline to Plaintiff.

58.     Winsett, and others, then began sabotaging Plaintiff's ability to service her foster families. A few examples follow:

    a.    Plaintiff was directed to stop visiting certain parents and children as often as she previously did;

    b.    AL-Mentors changed Plaintiff's hours and compensation structure such that she has no choice but to deviate from established routines with families;

    c.    Winsett began interfering with AL-Mentor's much-needed (and contractually owed) payments to the families Plaintiff works with;

    d.    Plaintiff has been unable to obtain critical support, which was available prior to her complaints. For example, a foster child became a suicide risk and needed intervention, and Plaintiff's efforts to protect the child were, for the first time ever, ignored; and

    e.    Treatment plans necessary for Plaintiff to do her job effectively are now suspiciously unavailable, and Plaintiff cannot obtain them despite her best efforts.

59.    After providing the foregoing myriad reasons for foster parents to find fault with Plaintiff, Winsett (among others) began calling Plaintiff's parents fishing for negative information to use against her, but she did not succeed.

60.    Accordingly, Winsett then began calling the foster children directly and probing them for information to use against Plaintiff, asking questions like: "How do you feel about Takiya?"; "Is she coming over on time?"; and "How many days a week does she see you?"

61.    In late August 2021, Dorothy Malone, one of Plaintiff's foster parents, confronted Ataska Winsett publicly about this behavior, which Ms. Malone described as very strange based on her years of experience with Defendant.

62.    About a week later, in early September 2021, AL-Mentors dismissed Malone from its Program in breach of Defendant's contract with Malone.

63.    On September 13, 2021, Plaintiff received her first ever performance evaluation. She received mediocre evaluations in several key aspects.

64.    Written evaluations were not a customary practice at AL-Mentor and prior to lodging complaints about discrimination, Plaintiff had never received one.

65.    Plaintiff attempted to obtain specific details about how she could improve any alleged deficiencies, and she is still waiting.

66.    Interestingly, Plaintiff's <u>verbal</u> annual performance discussion with Ms. Dear was much more positive than the document indicates.

67.    Plaintiff asked Ms. Dear if marked performance improvement could possibly result in raises, bonuses, or other incentives.

68.    Ms. Dear told Plaintiff she was not eligible for any such incentives. Strangely, the position Plaintiff holds is currently available online and an annual bonus plan, among other things, is part of the benefits package.

69.    With the fear of retaliatory termination swinging over her head like Damocles' sword, Plaintiff has become physically and mentally exhausted.

70.    Plaintiff continues to be employed by AL-Mentors but given the litany of retaliatory acts on their part, she is in constant fear of termination.

71.    Plaintiff has challenged the above-cited employment matters with

respect, tact, and grace on numerous occasions in verbal and written complaints to her entire reporting structure alongside AL-Mentor's Human Resources Department.

72.     To that end, Plaintiff has had to voice her concerns about retaliatory actions and animus every month since she filed her first EEOC Charge in May 2021.

73.     This lawsuit is Plaintiff's latest attempt to obtain justice, and some sense of peace, equality, and a work environment free from unlawful retaliation.

## CAUSES OF ACTION

### Count I
### (Racially Hostile Work Environment in
### Violation of Title VII and 42 U.S.C. § 1981)

74.     Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 4-5, 8-11, and 13-51 above as if fully repeated and set forth herein.

75.     As an African American, Plaintiff belongs to a protected group, and the hostile work environment claim made Count I of this Complaint is based upon Plaintiff's race.

76.     Defendant subjected Plaintiff to racial harassment in the form of a hostile work environment.  In support of this averment, Plaintiff states she was intentionally subjected to, among other things: (1) outrageously offensive racist

comments by Alex Morgan like being referred to as a slave in the field, nigger, wig-wearing monkey, nigga, nigger bitch, and numerous other similarly horrific racially derogatory terms; (2) severe, race-based threats against her life, including finding a noose in her backyard and being reminded over-and-over again that Morgan's family hangs and lynches "blacks"; (3) offensive comments and actions by supervisors such as Meranda Bice who often referred to African Americans as "these people" and accused them of being greedy and "just wanting money," and Bice's belief that African American employees were inferior (lazy and incompetent); (4) being excluded by AL-Mentor's Caucasian management and employees from comradery and office group chats, which often contained racially offensive comments and content; and, among many other things;  (5) being ignored and abandoned by Caucasian managers from the Birmingham Program Director all the way to the State Director for almost two years despite multiple complaints about Morgan's racist comments, attitude, and actions.

77.    The harassment and hostile work environment described herein was severe, pervasive (constant and continuous, ¶ 23, *supra*), humiliating, and it unreasonably interfered with Plaintiff's work performance to such an extent that the racial harassment and hostile work environment altered the terms and conditions of Plaintiff's employment and created a racially discriminatory, abusive working environment.

78.     AL-Mentor is liable under Title VII and Section 1981 for the racial harassment. Defendant knowingly employed the individuals who created the racially hostile work environment, including Alex Morgan and Meranda Bice, and ignored serious, corroborated complaints about horrific, racist misconduct for years. Further, this intentional discrimination against Plaintiff affected her enjoyment of the benefits, privileges, terms, and conditions of her employment and contractual relationship with Defendant.

79.     These discriminatory acts proximately caused Plaintiff to suffer severe emotional distress, mental anguish, embarrassment, humiliation, shame, and trauma, and the potential for financial losses.

80.     Plaintiff seeks declaratory and injunctive relief, interest, nominal, compensatory and punitive damages for humiliation, embarrassment, and mental anguish, costs, attorneys' fees and, to the extent Plaintiff suffers financial losses, an award of back pay, front pay, and reinstatement, along with any other relief the trier of fact may assess, or the Court may Order.

### Count II
### (Retaliation/Retaliatory Hostile Work Environment in Violation of Title VII and 42 U.S.C. § 1981)

81.     Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 4-5, 8-11, 13-27, 35-73 above as if fully repeated and set forth herein.

82.     This is a claim against AL-Mentor for unlawful and intentional acts of retaliation against Plaintiff for engaging in statutorily protected activity, which affected her enjoyment of the benefits, privileges, terms, and conditions of her employment and contractual relationship with Defendant.

83.     Plaintiff engaged in statutorily protected activity when she complained to Cassidy Dear, her direct report, in approximately late March 2021 about Alex Morgan and race discrimination. Plaintiff again engaged in protected activity in early April 2021 when she sent a detailed email titled "Racism and Harassment in the workplace" to her supervisors and to AL-Mentor's Human Resources.  Plaintiff's EEOC Charges in May and August 2021 were statutorily protected, as is this lawsuit along with all the verbal and written complaints Plaintiff has made to AL-Mentor since May 2021 regarding unlawful employment practices. Defendant, of course, knew Plaintiff engaged in these statutorily protected activities.

84.     Upon information and belief, shortly after Plaintiff's first complaint in 2021, she was accused of fraud, falsely and for the first time.  Within a few days of Plaintiff's first formal complaint to HR in April 2021, Plaintiff found a noose in her yard, and her cell phone began ringing with calls from Arab, Alabama. The drug test, arbitration agreement, discipline, and evaluation (among the other things detailed in the following paragraph) followed, one after the other, all for the first time and only after Plaintiff opposed race discrimination in the workplace.

85.     In retaliation for Plaintiff's protected activity, AL-Mentor subjected her to the following adverse employment actions which would dissuade a reasonable worker from making or supporting a charge of discrimination: (1) ignored and abandoned by her entire Caucasian chain of command despite serious, corroborated complaints about Morgan's racist attitude and actions; (2) taunted and threatened by racist symbols, remarks, and phone calls from Arab, Alabama; (3) singled out for a "random" drug test; (4) repeatedly threatened with termination for refusing to sign away her right to a jury trial, a flagrant violation of federal anti-retaliation laws, *see Knox v. Roper Pump Company*, 957 F.3d 1237 (11th Cir. 2020) (reversing district court and finding that forcing contract as condition of employment on discharged employee who complained about race discrimination constituted retaliation under Title VII); *see also Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261 (11th Cir. 2008); (5) fabricated disciplinary documents and meetings like those related to the July 2021 "record of discussion"; (6) supervisors fishing for negative information to use against her; (7) obstructing Plaintiff's ability to do her job and service families as detailed in paragraph 58, *supra*; (8) mediocre performance evaluation in several key aspects; (9) having to watch AL-Mentor retaliate against a foster parent who stood up for Plaintiff; and, among other things, (10) being denied financial opportunities, such as an annual bonus, available to Therapists who have not opposed unlawful workplace discrimination.

86.     Defendant's unlawful retaliatory acts proximately caused Plaintiff to suffer severe emotional distress, mental anguish, embarrassment, humiliation, shame, and trauma, and the potential for financial losses.

87.     Plaintiff seeks declaratory and injunctive relief, interest, nominal, compensatory and punitive damages for humiliation, embarrassment, and mental anguish, costs, attorneys' fees and, to the extent Plaintiff suffers financial losses, an award of back pay, front pay, and reinstatement, along with any other relief the trier of fact may assess, or the Court may Order.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant the relief sought through each of the above-stated Counts and:

a.      Grant a permanent injunction enjoining Defendant, its officers, successors, assigns and all persons in active concert or participation with it, from engaging further in its discriminatory treatment on the basis of race and retaliation based on protected activity;

b.      Order Defendant to institute and carry out policies, practices and programs which provide equal provisions and employment opportunities for all employees, and which eradicate the effects of its past and present unlawful employment practices, including implementing policies against race discrimination in the workplace and against retaliation for engaging in protected activities;

c.      Order Defendant to make Plaintiff whole by providing the above-request relief including nominal, compensatory, and punitive damages with prejudgment interest, in amounts to be proved at trial, and other affirmative relief necessary to

eradicate the effects of its unlawful employment practices, including, but not limited to, termination of Ataska Winsett, Jenni Akins, and Deanna Hand;

d.      Award the Plaintiff her costs and expenses, including reasonable attorney fees; and

e.      Award such other and further relief which this Court deems necessary and proper.

Finally, given that Plaintiff is a current employee and Defendant's retaliatory acts are continuing in nature, Plaintiff hereby notifies AL-Mentor that she intends to amend this complaint to capture further acts of retaliation (*e.g.*, termination). Plaintiff avers that justice would require such an amendment, and that Defendant cannot defeat Plaintiff's efforts to amend by claiming prejudice in light of this express notice. *See* Fed. R. Civ. P. 15(a)(2).

PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY

Respectfully submitted,

Brian O. Noble
ASB-9735-R39N
Co-Counsel for Plaintiff

Artur Davis
ASB-3672-D56A
Co-Counsel for Plaintiff

OF COUNSEL:

CAPSTONE LAW, LLC
Brian O. Noble, Esq.
3105 Sunview Drive 43888
Vestavia, Alabama 35243
Phone: (205) 578-1210
E-mail: brian.noble@caplawllc.com

HKM EMPLOYMENT ATTORNEYS
Artur G. Davis, Esq.
3355 Lenox Road, NE Suite 705
Atlanta GA 30326
Phone: (404) 220-9165
Email: adavis@hkm.com

**Defendant to be hand-served at:**
**National Mentor Healthcare, LLC**
**(Entity ID Number 607 – 547)**
**Corporation Service Company, Inc.**
**641 South Lawrence Street**
**Montgomery, Alabama 36014**